NATIONAL SPINNING COMPANY

v.

The CITY OF WASHINGTON, NORTH CAROLINA, a municipal corporation.

No. 704 Civ.

United States District Court,
E. D. North Carolina,
Washington Division.

May 4, 1970.

Thomas J. White, III, of White, Hooten & White, Kinston, N. C., for plaintiff.

W. B. Carter, Jr., of Knott & Carter, Lee E. Knott, Jr., Washington, N. C., for defendant.

## MEMORANDUM OPINION AND ORDER

LARKINS, District Judge:

Now comes this cause before the Court as a Motion to Dismiss, filed by the Defendant, on the grounds that the Court lacks jurisdiction over the parties or the subject matter of this action because there is no diversity of citizenship, to wit: Plaintiff's Principal Place of Business, Plaintiff being Incorporated in the State of New York, allegedly being in the State of North Carolina and thusly says the Defendant diversity is lacking as required by the provisions of Title 28, United States Code Annotated, Section 1332(a) (1) and (c).

The instant motion is before the Court in a civil action resulting from a dispute between the parties as to utilities rates and amounts due under contract provisions.

Plaintiff responds to the motion, saying that Plaintiff's Principal Place of Business is in the State of New York.

## FINDINGS OF FACT

The Court finds that the Defendant has abandoned its contentions that the Court lacks jurisdiction over the parties, Defendant having offered no evidence in support of said contention, and will deal, for the purposes of Defendant's Motion to Dismiss, in the subsequent Findings and in the Court's Conclusions of Law, solely with the question of the Court's jurisdiction over the subject matter of this action.

The corporate Plaintiff here, National Spinning Company, Incorporated, first became a corporate entity by virtue of the grant of Charter from the State of New York in 1919; Adverse Examination of Joseph Leff, p. 3. The corporation was engaged exclusively in the business of yarn sales to knitting concerns for thirty-four years of its existence, its first step into manufacturing coming in 1953 with the construction of the initial plant operation in Washington, North Carolina. (Adv.Exam. Joseph Leff, p. 4) supra. The peculiar industry in which National Spinning Company, Incorporated (hereinafter referred to as National Spinning) is engaged, is properly characterized as the "sales yarn business". (Adv.Exam. Joseph Leff, p. 24) supra. This type of business classification is used to denote the dual function of National Spinning in manufacturing its yarn product and the sale of that same yarn, and to place emphasis on the importance of the marketing function of this corporate entity in that its normal course of business is to secure the sale of its product before manufacture thereof is undertaken. (Adv. Exam. Joseph Leff, pp. 23–26) supra.

The weight to be given the sales function of National Spinning is best shown by the fact that during its existence from 1919 it has for a longer period been without manufacturing facilities than it has with them. But it must be noted that when National Spinning did in fact alter its corporate function from that of merely a yarn "jobber" to that of a manufacturer and supplier of yarn goods, pure sales orientation of the company was markedly reduced.

Since the addition of National Spinning's manufacturing operations in North Carolina in 1953 and thereafter, the mode of conducting business has evolved to be essentially as set out below.

Sales and general company offices are located in New York, Los Angeles, Cleveland, Philadelphia (phone), Miami (phone), Greensboro, Chattanooga, Washington, N.C., Whiteville, Warsaw, Beulaville. All of the officers and directors of the corporation live and work in New York State, with the exception of one officer/member of the board in Ohio. (Adv.Exam. Joseph Leff, pp. 38, 39, 41 & 42) supra.

The following activities of the company are carried out from the New York offices: corporate and policy planning,

corporate financing, sales and marketing, public relations, general administration from the Director-Officer level including purchasing approval, and corporate meetings. (Adv.Exam. Joseph Leff, pp. 42, 43, 47, 48, 49, 50, 51 & 67) supra.

However, substantially over ninety-five per cent. of the company's yarn is manufactured in North Carolina. (Defendant's Exhibit "B" pp. 3 & 4.) (Adv. Exam. Joseph Leff, p. 34.) supra. Of Two thousand one hundred and fifty-nine National Spinning employees, (2159), Two thousand and fifty-seven (2057) are employed in North Carolina. Plaintiff's Answers to Defendant's Interrogatories, Nos. 9 & 10.

All real estate owned by the Plaintiff is held in North Carolina. (Adv.Exam. Joseph Leff, p. 23) supra; Defendant's Exhibit "A" pp. 8 & 9. Officers of the corporation are in North Carolina, at the plants, approximately sixty (60) times a year. (Adv.Exam. Joseph Leff p. 61.) supra.

"Customer service people" are at the plants in North Carolina at least once a month. (Adv.Exam. Joseph Leff, p. 61) supra. Internal auditing, though the personnel are from the New York office, is conducted at the plants in North Carolina on a systematic basis. (Adv.Exam. Joseph Leff, p. 67) supra. Central purchasing activities, engineering, and accounting are conducted at the Washington, North Carolina office. (Adv. Exam. Joseph Leff, pp. 66 & 67) supra.

At National's Computer and Communications Facilities in Washington, North Carolina, the following activities are carried out: processing of customer orders and invoices; production capabilities projections; statistical compilation and analysis of personnel, sales, production, and finance; inventory control; sales forecasts; distribution-delivery schedules preparation; correlation of invoices, accounts receivable, and financial reports; coordination of warehousing, shipping and distribution; and the center further serves as the network hub for direct phone lines and teletype system links to most National plants and sales offices, as well as serving as the dispatching point for National's corporate plane in service to corporate officers and employees. Defendant's Exhibit "B", p. 75.

Virtually all of the tangible assets of the company are held in North Carolina. Defendant's Exhibit "A", pp. 8 & 9, Plaintiff's Answer to Defendant's Interrogatories Nos. 11 & 12, (Adv.Exam. Joseph Leff, pp. 15, 16 & 17) supra.

Though it is true that much of corporate policy and planning are conducted from the New York offices of the company in question, it is apparent that the management of the daily on-going affairs of running the business, both in sales and manufacturing, is carried out within the State of North Carolina. Production of yarn at the plants and the processing thereof is supervised at each individual site, subject to the executive directly in charge of manufacturing at Washington, North Carolina. Integration of the sales and manufacturing functions, as well as the daily administration of production and distribution of goods, is carried out at the company's computer and communications facility at Washington, North Carolina. The importance of the corporate activities conducted within the State of North Carolina is highlighted by the fact that company officers must come into the State on the average of more than once a week throughout the year. That the company's center for records keeping, communications and statistical planning is located in Washington indicates that the "nerve center" of this corporation is within the State of North Carolina.

General corporate offices are maintained in New York State for obvious reasons—greater ease of corporate financing (both for loan and invested capital), entree to national and international markets not as easily established from a North Carolina base, ease of maintenance for existent marketing and procurement ties, close proximity of professional and business services not available in North Carolina, et cetera.

However, but for the operations conducted by the corporation within the State of North Carolina, National, as it is presently structured, could not operate. The Court is of the considered opinion that the same test, when applied to the State of New York, as per National Spinning, does not show that state to be the "nerve center" for the company.

## CONCLUSIONS OF LAW

■ It is generally known that the amendment to section 1332 of Title 28, U.S.C.A., was made for the purpose of restricting federal jurisdiction in diversity cases. It is well recognized that it was not the purpose of the amendment to expand federal jurisdiction in such cases. Diesing v. Vaugn Wood Products, Inc., 175 F.Supp. 460 (W.D.Va., 1959).

■ Though the question of where a corporation's "principal place of business" is, will always be a question of fact to be determined by the Court on a case-by-case basis, the principal place of business for purposes of diversity jurisdiction is more likely to be where the actual physical operations of the company are carried on and directed, rather than where occasional high level policy decisions are made. Leve v. General Motors Corp., 246 F.Supp. 761 (D.C.N.Y., 1965).

For it is the activities of a corporation, rather than the occasional meeting place of policy-making directors of the corporation which indicate the corporation's principal place of business. Kelly v. U. S. Steel Corp., 284 F.2d 850 (C.A. Pa., 1960). The directors can meet anywhere to be determined solely by their choice, as can shareholders and corporate officers.

In *Kelly*, supra, the Court held that Pennsylvania was the "principal place of business" of United States Steel, though the following corporate activities were conducted in the State of New York: the meetings of the Board of Directors, the Executive Committee of the Board, the Finance Committee; offices of the Secretary, Treasurer, Comptroller and the General Counsel; ownership of real estate; major banking activities; corporate pension control and securities investments; as well as corporate planning.

■ So as per the requirements of the "nerve center" test, it is not necessarily where the final decisions on corporate policy are made, but rather where the "center of corporate activity" is that determines the principal place of business. *Kelly*, supra.

■ The burden of proving that diversity jurisdiction exists rests on the party asserting that such diversity is present. Thomson v. Gaskill, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942).

■ And " * * * the corporation's principal place of business is that place which actually functions as the nerve center of the enterprise radiating direction and control over the conduct of the corporate business as a whole." Wear-Ever Aluminum, Inc. v. Sipos, 184 F.Supp. 364 (S.D.N.Y., 1960).

■ Where a corporation is engaged in multistate activities, with offices, facilities or plants in various states, the issue of the location of its principal place of business cannot be resolved by fragmentation of its activities at specific places; that is to say sales and manufacturing in the case at bar. It is not answered by a separation of corporate activity into component parts. The issue must be resolved on an over-all basis. "It is governed by the totality of corporate activity at a given place, which, * * * may be said to represent the 'center of gravity' of corporate function." Scot Typewriter Co., Inc. v. Underwood Corp., 170 F.Supp. 862.

■ In the case at bar, the Court need not determine whether National Spinning Company is essentially a sales corporation or a manufacturing corporation, for the Court is of the opinion that as to both functions the center of gravity is in the State of North Carolina.

According to either of the three tests available to the Court, to wit: the "operating assets test", the "center of corporate activity test", or the "nerve center test", National Spinning Company, Incorporated is a multistate corporation, incorporated in the State of New York, and having its Principal Place of Business in the State of North Carolina. And therefore diversity of jurisdiction is lacking in the case at bar.

## ORDER

Now, therefore, in accordance with the foregoing, it is:

Ordered, that the Motion to Dismiss be, and the same hereby is Allowed.